**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JORDAN E. LUBIN, CHAPTER 7 TRUSTEE, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CINCINNATI INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |
| | : | CIVIL ACTION NO. |
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF INTEGRITY BANK OF ALPHARETTA, GEORGIA, | : | 1:09-CV-2985-RWS |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff-in-Intervention, | : | |
| | : | |
| v. | : | |
| | : | |
| JORDAN E. LUBIN, CHAPTER 7 TRUSTEE, | : | |
| | : | |
| Defendant-in-Intervention. | : | |
| | : | |
| | : | |

**<u>ORDER</u>**

This case comes before the Court on the Plaintiff-in-Intervention FDIC's

Motion to Dismiss Trustee's Complaint and Cross-Claim Counts One and Two ("Motion to Dismiss") [35], Plaintiff's Motion to Compel Discovery ("Motion to Compel") [39], Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Cross-Claims against the FDIC ("Plaintiff's Motion for Summary Judgment") [42], and the FDIC's Motion for Summary Judgment on its Intervention Complaint Counts One and Two and Trustee's Cross-Claim Count Three ("FDIC's Motion for Summary Judgment") [44].

## Background

### I.      Bankruptcy

Integrity Bancshares, Inc. ("Debtor" or "Bancshares"), the debtor in bankruptcy, is a Georgia bank holding company and parent of Integrity Bank ("Integrity" or "Bank").  (Complaint, Dkt. [1] at ¶ 1).  On August 29, 2008, Integrity was closed by the Georgia Department of Banking and Finance and placed into receivership with the Federal Deposit Insurance Corporation as receiver ("FDIC-R").  (Id.).  Following the closing of Integrity, the Debtor filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the Northern District of Georgia on October 13, 2008.  (Id. at ¶ 2).  The Plaintiff, Jordan E. Lubin, is the Chapter 7 Trustee ("Trustee") for Bancshares. (Id. at ¶ 3).

## II.    Previous Adversary Proceedings

On February 3, 2009, the Trustee initiated Adversary Proceeding No. 09-06058 by filing a declaratory judgment complaint ("Declaratory Judgment Action") against Cincinnati Insurance Company ("CIC") and former directors and/or officers of the Debtor, the Bank, or both, "to adjudicate the respective rights, duties, and obligations of the parties under the Financial Institutions Blue Chip Policy # BCP 873 72 76 issued by CIC to the Debtor, the Bank, . . . [and] officers and directors of the Debtor and Bank . . . ."  (Lubin v. Cincinnati Ins. Co., 1:09-cv-1156-RSW, Dkt. [14] at ¶ 11).  The Trustee also filed a damages action ("Damages Action") by initiating Adversary Proceeding No. 09-06057 against the same individual defendants named in the declaratory judgment complaint seeking damages for breach of fiduciary duties and negligence.  (Lubin v. Skow, et al., 1:09-cv-1155-RSW).  The FDIC-R sought leave to intervene in both actions arguing that it owned the claims that the Trustee sought to assert against Defendants, and the requested leave was granted.

The Court dismissed both the Declaratory Judgment Action and the Damages Action, finding that the Trustee lacked standing to assert either claim, because under the Financial Institution Reform, Recovery and Enforcement Act

AO 72A
(Rev.8/82)

of 1989 ("FIRREA") all shareholder derivative claims against officers of the

Bank belonged to the FDIC and the Trustee did not allege any direct or unique

harm to the Debtor.  (<u>Skow, et al.</u>, 1:09-cv-1155-RSW, Dkt. [42]; <u>Cincinnati</u>

<u>Ins. Co.</u>, 1:09-cv-1156-RSW, Dkt. [44]).  The Eleventh Circuit affirmed the

dismissal of both actions, stating:

> Because the Complaint does not sufficiently allege direct harm to
> the holding company, the trustee lacks standing to sue officers of
> the bank.  Also, although the trustee has standing to sue officers of
> the holding company, the Complaint fails to plead a claim for
> which relief may be granted on that issue.

<u>Lubin v. Skow, et. al.</u>, 2010 WL 2354141, *1 (11th Cir. June 14, 2010).

## III.   Present Action

The present action involves Depository Institutions Blanket Bond No.

B80-535147 (the "Bond"), issued by CIC to Bancshares.[1]  (Dkt. [1] at ¶ 10).

On October 27, 2009 the Trustee, on behalf of Bancshares, filed this action

against CIC seeking recovery under the Fidelity Insuring Agreement of the

Bond.  (<u>See</u> Complaint, Dkt. [1]).  Under this provision, the Bond indemnifies

the "Insured" for "[l]oss resulting directly from dishonest or fraudulent acts of

---

[1] Integrity Bancshares, Inc. is the only "Insured" identified in the Bond.  (Dkt.
[4-1] at p. 2 of 33).

4

an Employee committed alone or in collusion with others."[2]  (Insuring

Agreement A, Dkt. [4-1] at p. 25 of 33).  The Bond does not cover "indirect or

consequential loss of any nature."  (Exclusion W, Dkt. [4-1] at p. 30 of 33).

> The Complaint alleges that Bancshares
>
> suffered losses resulting from dishonest or fraudulent acts of
> certain individuals who at all times relevant were "Employees"
> under the Bond (the "Employees"), for which Defendant is
> obligated to indemnify Bancshares.  The Employees include
> Steven Skow, at all times relevant Chief Executive Officer and
> Chairman of Bancshares and the Bank; Todd Foster, at all times
> relevant Vice President of the Bank; Robert Skeen, at all times
> relevant Executive Vice President of the Bank; and Douglas
> Ballard, at all times relevant Senior Vice President of the Bank.

(Dkt. [1] at ¶ 14).  The Trustee alleges that the dishonest and fraudulent acts of

the Employees for which the Bond provides coverage involve the approval,

origination, collateralization, and issuance of loans by Integrity.  (Dkt. [1] at ¶

15(i)-(xi)).  A proof of loss (the "Proof of Loss") providing details of the

dishonest and fraudulent acts of Skow, Foster, Skeen, and Ballard was sent to

CIC by Integrity on November 30, 2007.  (Dkt. [47-7]).  CIC denied the claims

---

[2] The Bond further states that it "affords coverage only in favor of the Insured.
No suit, action or legal proceedings shall be brought hereunder by any one other than
the named Insured."  (Dkt. [4-1] at p. 31 of 33).

AO 72A
(Rev.8/82)

presented by Integrity in the Proof of Loss and has also refused to indemnify Bancshares.[3]  (Dkt. [1] at ¶ 24).

On January 7, 2010 the FDIC moved to intervene in this action and on January 20, 2010 the Court granted the FDIC's Amended Motion to Intervene. (Dkt. [16]).  The FDIC, as receiver of Integrity, asserts that its succession to "all rights, titles, powers, and privileges of [Integrity]" includes Integrity's claims under the Bond.  (Dkt. [17] at ¶ 9 (citing 12 U.S.C. § 1821(d)(2)(A)(i))).  In its Complaint in Intervention, the FDIC seeks reformation of the Bond to include Integrity as a named insured under the Bond in its own right (Count I), and also seeks a declaration that the FDIC, as Receiver of Integrity, owns and has the exclusive right to assert the claims set forth in the Proof of Loss (Count II).  The FDIC alleges that the failure to include Integrity as a named insured in the Declarations page of the Bond was caused by mutual mistake of the parties and/or their agents, contrary to the intent of the parties.  (Dkt. [17] at ¶ 26).

In its Answer [19] to the Intervenor Complaint, the Trustee asserts cross-claims against the FDIC.  The Trustee seeks a declaration that the Bond and all of Bancshares' contractual and legal rights thereunder, including the right to

---

[3] In an August 12, 2008 letter from CIC to Integrity, CIC stated that, "[b]ased upon the information currently available, the Bank has not established a covered loss under the Bond."  (Dkt. [17] at ¶ 14).

recover the losses identified in the Proof of Loss, are property of the Bancshares bankruptcy estate (the "Bankruptcy Estate") (Count I) and that the FDIC lacks standing to seek reformation of the Bond (Count III). The Trustee also seeks enforcement of the bankruptcy stay by enjoining the FDIC from taking any action to exercise control over the Bond, including exercising the right to seek recovery for losses under the Bond (Count II).

The Motion to Dismiss [35] and the Motions for Summary Judgment [42, 44] currently before the Court in this action can be resolved by answering three questions: (1) does the Trustee sufficiently allege a cause of action for breach of contract against CIC; (2) does the Trustee have a right to bring a claim under the Bond; and (3) does the Bank have a right to bring a claim under the Bond.

## Discussion

## I.     Applicable Legal Standards

### A.     Standard for Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. ----, 129 S. Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged.  Id.

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 129 S. Ct. at 1949.  The court does not need to "accept as true a legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at 555.

In ruling upon a motion to dismiss, the Court is not limited to the four corners of the complaint, but may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record in the case . . . ."  5B

8

Wright & Miller § 1357; see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d (2007) ("courts must
consider the complaint in its entirety, as well as other sources courts ordinarily
examine when ruling on Rule 12(b)(6) motions to dismiss").

B.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be
granted "if the movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P.
56(a). "The moving party bears 'the initial responsibility of informing the . . .
court of the basis for its motion, and identifying those portions of the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, which it believes demonstrate the absence of a genuine issue
of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259
(11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.
Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotations omitted)). Where the
moving party makes such a showing, the burden shifts to the non-movant, who
must go beyond the pleadings and present affirmative evidence to show that a
genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material.  Id. at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  Id.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

10

C.    Declaratory Judgment Standard

The Declaratory Judgment Act provides: "in a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such determination, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  In order to bring a declaratory judgment action an "actual controversy" must exist. Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir.1995).  The issue is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941).

**II.    Sufficiency of the Complaint**

The Trustee's claim against CIC is for breach of contract.  "The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Kuritzky v. Emory Univ., 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008).  In order to state a claim for breach of contract under

AO 72A
(Rev.8/82)

Georgia law, the Trustee's Complaint must demonstrate that it is the appropriate party to complain about the alleged failure of CIC to comply with the terms of the Bond.

Insuring Agreement A of the Bond, at issue here, provides coverage for losses that: (1) are direct; (2) are caused by an employee's act; and (3) such act or acts are dishonest or fraudulent.  (Dkt. [4-1] at p. 25 of 33).  The Bond defines "Employee" in relevant part, as "an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder."  (Definition D(1), Dkt. [4-1] at p. 28 of 33).  The Complaint does not allege that Foster, Skeen, or Ballard were employees of Bancshares, but rather were officers of Integrity.  (Dkt. [1] at ¶ 14).  The Complaint alleges that Skow was an officer of Bancshares and the Bank.  (Id.). Assuming that Skow meets the Bond's definition of employee, his alleged actions must still cause direct harm to Bancshares in order to fall under the Bond's coverage.[4]

The Complaint does not allege that Skow, or any other employee named in the Complaint, caused any direct harm to Bancshares.  As noted above, the

---

[4] The Bond does not cover "indirect or consequential loss of any nature." (Exclusion W, Dkt. [4-1] at p. 30 of 33).

allegations of the Complaint deal solely with dishonest and/or fraudulent acts

associated with loans issued by Integrity, as does the Proof of Loss submitted

by Integrity to CIC.  The Complaint states that,

> [a]s *officers of the Bank*, at all relevant times each of the
> Employees owed duties of care and loyalty to operate and manage
> the affairs of the Bank in the best interests of Bancshares and its
> shareholders.

> In committing the dishonest or fraudulent acts identified above, the
> Employees violated duties of care and loyalty owed to Bancshares,
> causing harm and losses to Bancshares for which it may recover
> under the Bond.

(Dkt. [1] at ¶¶ 17-18 (emphasis added)).  However, simply stating that the

employees, all apparently acting as officers of the Bank, caused harm to

Bancshares for which it may recover under the Bond, does not make it so.

Additionally, alleging that "[w]hile committing some or all of the dishonest or

fraudulent acts identified above, Steven Skow acted as an officer of both

Bancshares and the Bank," without any supporting factual allegations to

indicate that he was acting as an officer of Bancshares, is insufficient to state a

claim.[5]  (Dkt. [1] at ¶ 19).

---

[5] The Proof of Loss submitted to CIC states that "[Integrity] has sustained a
loss resulting directly from dishonest or fraudulent acts of certain employees of
[Integrity]."  (Dkt. [47-7] at 1).  All of the allegations concerning Skow, or the other
three Bank employees, as set forth in the Proof of Loss involve conduct associated
with the Bank's disbursement of loans.  The Proof of Loss does not reference

13

As the Trustee has stated, "[i]n Georgia, insurance is a matter of contract and the parties to an insurance policy are bound by its plain and unambiguous terms." (Dkt. [42-2] at 9 (quoting <u>Richards v. Hanover Ins. Co.</u>, 250 Ga. 613, 614, 299 S.E.2d 561, 563 (1983)). Further, "[c]ontract construction is a question of law for the court." (<u>Id.</u> (citing O.C.G.A. §§ 13-2-1 through 13-2-4)). As a matter of law, the Trustee cannot have a claim under the Bond without alleging any direct harm to Bancshares caused by employees of Bancshares. In other words, the Trustee has not legally alleged a breach of the contract if its claim does not fall within the terms of the contract. Any harm to Bancshares resulting from misconduct associated with loans issued by the Bank are indirect, and thus excluded from coverage under the Bond. (Exclusion W, Dkt. [4-1] at p. 30 of 33). As this Court stated in a previous adversary proceeding filed by the Trustee,

> Harm caused to the Bank by Defendants likely resulted in harm to the Debtor as a shareholder of the Bank, but any such harm is secondary and predicated upon injury to the Bank. The Trustee has not alleged any claims of mismanagement of the Debtor holding company.

<u>Lubin v. Cinncinnati Ins. Co.</u>, No. 1:09-cv-1156-RWS, 2009 WL 4641765

---

Bancshares in any fashion.

AO 72A
(Rev.8/82)

(N.D. Ga. Nov. 30, 2009).[6]  In order to have a claim for coverage under the Bond, the Trustee must allege that Bancshares experienced direct harm as a result of the dishonest or fraudulent acts of a Bancshares employee.  Further, the only proof of loss submitted to CIC for a claim of coverage under the Bond was based upon conduct taken by Bank officers acting on behalf of the Bank, not Bancshares.  Since no other proof of loss for coverage was submitted to CIC under the Bond, any claims the Trustee may be able to make of direct harm to Bancshares caused by Bancshares employees is now untimely.[7]  Therefore, Plaintiff's Complaint [1] is **DISMISSED**.

---

[6] The Court is cognizant that this adversary proceeding, a contract claim, requires an analysis distinct from that associated with a shareholder derivative claim. Nonetheless, the contract at issue presently, the Bond, limits coverage to direct harm.

[7] The Bond was terminated or cancelled on August 29, 2008 when the Bank was placed into receivership with the FDIC, which terminated CIC's "liability for any loss sustained by such Insured which is discovered after the . . . termination." (See Condition J(3), Dkt. [4-1] at 32 of 33 ("This bond shall be deemed terminated or cancelled as an entirety . . . immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials . . . .")).  There is no indication in the record that a second proof of loss was submitted to CIC for a claim of coverage under the Bond.  Since the Bond terminated more than two years ago, any new claim for coverage would be invalid, and also untimely according to the terms of the Bond.  (See Condition C(1)-(2), Dkt. [4-1] at 31 of 33).

## II.    Trustee's Right to Assert a Claim under the Bond

Despite the Trustee's failure to assert a cognizable claim under the Bond's coverage and its inability to do so on behalf of Bancshares,[8] there is still a question of whether the Trustee can bring a claim on behalf of the Bank and how the proceeds of any such claim would be handled.  The Bond states that, "[i]f two or more Insureds are covered under this bond, the first named Insured shall act for all Insureds."  (General Agreement F, Dkt. [4-1] at 28 of 33).[9] Assuming the contract is reformed to include Integrity as a named insured, the Trustee is correct that Bancshares would remain the first named insured.[10] However, the Trustee may only bring a claim under the Bond if the ability to bring such a claim is property of the estate, yet such an ability is not property of the Bankruptcy Estate.

---

[8] See footnotes 5 and 7, *supra.*

[9] The FDIC asserts that General Agreement F does not prevent it from asserting a claim on behalf of Integrity because Bancshares is not "covered" under the Bond. (Dkt. 49 at [11-12]). This assertion is based on a "covered" Insured being one that meets the requirements for indemnification under the Bond.  The FDIC argues that since Bancshares does not meet the requirements for indemnification, it is not "covered" under the Bond.  However, the Court cannot accept this definition of "covered" because the term is not defined in the Bond and no other provisions of the Bond attribute to it the definition advocated by the FDIC.

[10] See the deposition testimony of Scott Unger [58], one of CIC's Rule 30(b)(6) witnesses, discussed *infra*, at pp. 26-27.

The U.S. Code states that the "[p]roperty of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor."  11 U.S.C. § 541(b)(1).  Even if the Trustee brought an action under the Bond, the only potentially viable claim it could assert would be on behalf of Integrity and for the benefit of Integrity.  Such a claim is specifically excluded from the property of the Bankruptcy Estate.  Because the Bancshares estate is not entitled to the proceeds of the policy, it does not have the power to assert such a claim.

In proceedings such as the Bancshares bankruptcy, the Bankruptcy Code provides for an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3) (emphasis added).  Because the ability to bring a claim under the Bond is not property of the Bancshares estate, the automatic stay applicable to the Bancshares bankruptcy does not limit Integrity's ability to bring a claim under the Bond.  "To the extent that [Integrity] has a direct right to coverage under the polic[y] and to payment on account of [its] own [l]oss, . . . the processing and payment of [its] claims are not restrained by 11 U.S.C. § 362(a)."  In re Petters Co., 419 B.R. 369, 374 (Bankr. D. Minn. 2009).

17

**III.    FDIC's Right to Assert a Claim under the Bond**

In order for Integrity to be able to assert a claim under the Bond, it has to be a named insured under the Bond.  The Bond as written only lists Bancshares as a named insured.  However, the FDIC seeks reformation of the Bond to add Integrity as a named insured.  Even if the Bond is reformed, the Bond must still provide Integrity with an ability to bring a claim for loss under the Bond.  The Court will address these two issues in turn.

A.    Reformation of the Bond

The FDIC asserts that "the failure to include Integrity Bank as a named insured on the Bond was caused by mutual mistake of the parties and/or their agents, contrary to the intent of the parties."  (Dkt. [44-1] at 15).  Therefore the FDIC seeks reformation of the Bond to include Integrity as a named insured. Under Georgia law,

> [m]utual mistake, in relation to reformation, means a mistake shared by, or participated in by, both parties, or a mistake common to both parties; both must have labored under the same misconception in respect of the terms and conditions of written instrument, intending at the time of the execution of the instrument to say one thing and by mistake expressing another, so that the instrument as written does not express the contract or intent of either of the parties.

Lawton v. Byck, 217 Ga. 676, 681-82, 124 S.E.2d 369, 373 (Ga. 1962) (internal

AO 72A
(Rev.8/82)

punctuation and citation omitted); see also O.C.G.A. § 23-2-21(a) ("A mistake

relievable in equity is some unintentional act, omission, or error arising from

ignorance, surprise, imposition, or misplaced confidence.").  If the Bond, as a

result of mutual mistake, does not express the intent of the parties to it, then

reformation of the Bond is available.  Am. Mfrs. Mut. Ins. Co. v. E A Technical

Servs., Inc., 270 Ga. App. 883, 883, 608 S.E.2d 275, 276 (Ga. Ct. App. 2004);

see also Cherokee Nat'l Life Ins. Co. v. Coastal Bank of Ga., 239 Ga. 800, 803,

238 S.E.2d 866, 869 (Ga. 1977) ("Reformation is an action intended to 'do

equity' among the interested parties by changing completed transactions to

reflect true intentions.").

     The Trustee argues that the FDIC lacks standing to bring an action for

reformation, because Integrity is not named in the contract and therefore

Integrity is a stranger to the contract and may not bring an action in relation to

the contract.  (Dkt. [51] at 12).  If the Trustee's argument is to be accepted, then

an inadvertently omitted insured cannot bring an action to reform an insurance

policy to add the omitted insured to the policy as was originally intended by the

parties.  Such a position is contrary to Georgia law.  Georgia courts permit an

omitted party to bring a reformation action based on mutual mistake to add the

omitted party as a named insured.  E A Technical Servs., 608 S.E.2d at 276; see

19

also Ga. Farm Bureau Mut. Ins. Co. v. Wall, 242 Ga. 176, 179, 249 S.E.2d 588, 591 (Ga. 1978) ("We have found no case holding that insurance contracts are immune to suits for reformation.").

The Trustee also argues that because the language of the Bond is clear and it names only one insured, "there is simply no ground to look outside the four corners of the contract to consider the FDIC's parol evidence of alleged mistake." (Dkt. [51] at 11). Once again, such an argument would prevent any accidentally omitted insured from seeking reformation to be added to a policy as a named insured and is contrary to Georgia law. "The fact that the parol evidence contradicts the language of the written document clearly does not bar its admissibility, since the gist of a reformation action is that the written document does not accurately reflect the parties' agreement." Yeazel v. Burger King Corp., 526 S.E.2d 112, 117 (Ga. Ct. App. 1999); see also Wall, 242 Ga. at 176, 249 S.E.2d at 591 (stating parol evidence is admissible in suit for reformation of contract based upon alleged mutual mistake). Therefore the Court will consider the evidence in the record to determine whether there is any genuine dispute as to whether the parties to the Bond intended Integrity to be a named insured.

AO 72A
(Rev.8/82)

Sidney O. Smith, Inc. ("SOS") provided insurance brokerage services for Integrity and Bancshares.  (FDIC's Statement of Undisputed Material Facts ("SUMF"), Dkt. [44-2] at ¶ 1).[11]  Brent Jones and Sherrie Smith were the SOS employees responsible for the account of Integrity and Bancshares.  (Id. at ¶ 2).  SOS also served as the local agent for CIC with respect to certain CIC insurance policies issued in Georgia, including the Bond.  (Id. at ¶ 4).  From August 28, 2003 through August 28, 2006, Integrity and Bancshares both were listed as insureds on a fidelity bond issued by a member of the Chubb Group (the "Chubb Bond").  (Id. at ¶ 5).  Rita Gray was the senior financial officer of both Integrity and Bancshares whose job responsibilities included working with SOS to procure the Chubb Bond.  (Id. at ¶ 6).  These responsibilities were assumed by Kelly Klem who was hired as Integrity's Chief Operating Officer in May 2006.  (Id. at ¶¶ 9-10).

On July 12, 2006, SOS met with Klem to discuss the renewal process for multiple expiring insurance policies covering Integrity and Bancshares,

_____

[11] The Trustee does not dispute the factual assertions of many of the of the paragraphs contained in the SUMF, but does assert that many of them are not material or relevant to the FDIC's summary judgment motion.  (Plaintiff's Response to SUMF ("Pl.'s Res. to SUMF"), Dkt. [52]).  The Trustee also objects to some of the same paragraphs and others as containing legal conclusions rather than factual assertions.  (Id.).

including the Chubb Bond.  (Id. at ¶ 11).  Although Chubb was discontinuing

its line of policies that included those currently issued to Integrity and

Bancshares, Klem completed the Chubb renewal applications for SOS to use in

securing insurance quotes from different carriers.  (Id. at ¶¶ 12-13).  The Bank

and Bancshares were both listed as the "First Named Assured" or "Applicant"

on the applications submitted by Klem to SOS, which then sent the applications

to several insurance providers, including CIC, in order to secure quotes.  (Id. at

¶¶ 15-16; Pl.'s Res. to SUMF at ¶ 15).  On August 15, 2006, a CIC

representative sent a letter to SOS's Smith thanking her for submitting the

application and offered a quote for a three year fidelity bond.  (SUMF at ¶ 20).

The letter also stated that CIC "will need our [own] application for the Bond,

F600, and the [Kidnap and Ransom] policy which should be sent separately.

(Id. at ¶ 23).  SOS prepared a CIC "Commercial Insurance Proposal," in which

it only listed Bancshares as the named insured.  (Id. at ¶ 26).  However, this

was a mistake, as Jones testified that the proposal she submitted to CIC was

intended to include Integrity and Bancshares.  (Dkt. [44-3] at 125:14-24,

126:13-128:10).

SOS recommended that Integrity enter into coverage agreements with

CIC because the rates were more competitive.  (SUMF at ¶ 30).  Klem wanted

to seek a higher coverage limit for the fidelity bond, and after receiving pricing for the higher coverage decided that CIC was the most desirable option.   (Id. at ¶¶ 31-33).  On August 16, 2006, Klem presented Integrity Bank's Board of Directors ("Board") with a summary of insurance coverage bids that he had prepared, comparing Progressive's and CIC's quotes for fidelity and other insurance coverages, and recommended the CIC policies.   (Id. at ¶ 36).  On August 22, 2006, Klem completed and signed the Commercial Bank Operations Questionnaire (the Bond application), listing both Integrity and Bancshares as the response to "Name of Bank,"and forwarded the application to SOS for delivery to CIC.   (Id. at ¶¶ 42-44).  At the same time, Klem also prepared separate applications for a Kidnap, Ransom and Extortion Coverage Policy ("K&R Policy") and a Financial Institutions Blue Chip Policy ("Blue Chip Policy").  (Id. at ¶ 36).  On August 25, 2006, Integrity issued a check for $205,168 to SOS to pay the premiums for the Bond, the K&R Policy, the Blue Chip Policy,  and other new CIC policies.   (Id. at ¶ 45).  On September 19, 2006, SOS received a copy of the Bond from CIC, but it did not list Integrity as a named insured, and SOS was not aware of this until this litigation occurred. (Id. at ¶¶ 46-47; Dkt. [44-3] at 151:21-152:7, 18-24; Dkt. [44-4] at 77:11-17). Integrity was listed as a named insured on the K&R Policy and the Blue Chip

Policy, issued at the same time as the Bond.  (SUMF at ¶¶ 50, 52).  Elizabeth Carley, CIC's Rule 30(b)(6) witness, testified that it was "always [CIC's] impression that Integrity Bank should have been on the Bond," and this impression was confirmed by one of CIC's underwriters, who stated that not listing Integrity on the Bond was an error.  (Dkt. [44-9] at 28:1-2, 29:13-23).

     As noted above, on November 30, 2007, Integrity filed a Proof of Loss under the Bond seeking indemnification for losses resulting from the acts of four former employees.  On May 15-16, 2008, CIC's counsel wrote to these former Integrity employees and requested meetings to discuss "a fidelity claim submitted *by Integrity Bank . . . under Insuring Agreement A of the [Bond]*."  (SUMF at ¶ 54 (emphasis added)).  Additionally, CIC refused a policy name change submitted by SOS because pursuant to the Bond, it terminated when "the Insured," was taken over by a receiver.  (Id. at ¶ 60).  Integrity was taken over by a receiver, not Bancshares.  On October 31, 2008, CIC forwarded a check for the unearned premium on the Bond to the FDIC as Receiver of Integrity.  (Id. at ¶ 62).  Finally, representatives of SOS, CIC, and Integrity, all testified that they operated under the mistaken belief that both Integrity and

Bancshares would be listed as named insureds on the Bond.  (Id. at ¶¶ 66-68).[12]

Despite this record, the Trustee argues that the Bond should not be reformed to include Integrity as a named insured.  In order to reform a contract, "the evidence shall be clear, unequivocal, and decisive as to the mistake." O.C.G.A. § 23-2-21(c).  In light of this and the standard for granting a motion for summary judgment, the Trustee argues that the question of reformation of the Bond is uniquely unsuited to summary adjudication.  As evidence of this, the Trustee cites to Fox v. Washburn, 264 Ga. 617, 499 S.E.2d 513 (Ga. 1994), and Yeazel v. Burger King, 241 Ga. App. 90, 526 S.E.2d 112.  In Fox, the defendants brought a counterclaim for reformation of the contract.  499 S.E.2d at 513.  The Court there held that the conduct of the parties over the period of eight years, posed questions of intent and credibility that could only be resolved by a jury.  Id. at 514.  In Yeazel, the Court found that the trial court had correctly denied summary judgment on a reformation claim because the language of the contract contradicted some of the testimony of the parties.  526 S.E.2d at 118.  In addition, the Court in E A Technical Servs. found that reformation was not appropriate because the record presented an issue of fact

---

[12] The Trustee did not respond to SUMF paragraphs 66-68.  (See Dkt. [52]). Therefore, in accord with Local Rule 56.1(B)(2)(a)(2), these paragraphs are deemed admitted.

regarding how many insurance applications were prepared and the testimony on

this point was inconsistent and equivocal.  608 S.E.2d at 278.

In contrast, on the critical question of the intent of the parties, there is no

dispute in this case that SOS, CIC's local representative and representative for

Integrity and Bancshares for the procurement of insurance, CIC, and Integrity,

all intended that Integrity was to be a named insured under the Bond.  As

reasonable inferences against reforming the Bond, the Trustee asserts that

> the summary judgment evidence demonstrates that there is no
> dispute that CIC's practice and policy is that only the holding
> companies are typically listed on the declarations page of its
> policies . . .; that there was no additional insured endorsement
> requested or issued prior to the Bond's termination . . .; that there
> was no discovery of the alleged mistake until *after* the loss
> occurred . . .; and that when the FDIC raised "mistake" in this
> litigation, CIC refused FDIC's request to stipulate that a mistake
> occurred . . . .

(Dkt. [51] at 18).  The Trustee argues that this evidence along with the jury's

ability to make credibility determinations and disregard what it finds to be

unreliable evidence, make resolution of the issue of reformation inappropriate at

the summary judgment stage.

The Trustee cites to the deposition of Scott Unger, one of CIC's Rule

30(b)(6) witnesses, for the proposition that "there is no dispute that CIC's

practice and policy is that *only* the holding companies are typically listed on the

declarations page."  (Id. (emphasis added)).  However, the portions of Unger's

deposition relied upon by the Trustee only stand for the proposition that it is

CIC's practice to list the holding company as the first named insured on the

declarations page, not that it only lists the holding company on that page.  (Dkt.

[58] at 24-28, 111).[13]  The critical question in this action is whether the parties

to the Bond intended to have Integrity listed as an insured, not as the first

named insured.  As to its practice for additional insureds under a CIC policy,

Unger testified that one option is to list additional insured on the declaration

page.[14]  (Id. at 25:12-19, 26:7-11).  As to the Trustee's contentions that no

additional insured endorsement was requested and that the mistake was not

───────────────

[13] Interestingly, page 111 of Unger's deposition, cited by the Trustee, contains
the following colloquy:

> Q.    Okay.  And just one conclusory question.  Based on the
>       documents you have seen today, based on the underwriting
>       information that you reviewed beforehand based on your
>       conversations with Mr. Hartkemeier, isn't it true that in
>       Cincinnati's -- is it Cincinnati's belief that the bank, Integrity
>       Bank, in fact should have been a named insured under the bond,
>       and it was an error that the bank was not a named insured under
>       the bond?
>
> A.    Yes.

(Dkt. [58] at 110:23-111:7).

[14] In a letter to the FDIC's counsel, CIC's counsel stated: "[CIC] also
acknowledges that it is common for a Bond to be issued naming the bank holding
company as the First Named Insured and the bank itself as an additional insured."
(Dkt. [53-5] at 14 of 15).

27

discovered until after the loss occurred, it is explained by the unrebutted

testimony that all of the parties involved in procuring the Bond believed that

Integrity was a named insured, and none of the relevant parties discovered the

mistake until this action was initiated.  Finally, CIC's refusal to stipulate that

Integrity was a named insured under the Bond was because, among other things,

it was not aware at that time of "the intent of the party that was negotiating the

Bond on behalf of Bancshares (and potentially the Bank)."  (Dkt. [53-5] at 14 of

15).  However, following discovery in this action the intent of the SOS

employees negotiating on behalf of Bancshares and the Bank is evident.

Much of the evidence that demonstrates the intent of SOS, Integrity,

Bancshares, and CIC in the procurement and issuance of the Bond is

unrebutted, including: (1) Integrity was a named insured on the 2003 Chubb

Bond, which the CIC Bond was intended to replace; (2) Klem, Chief Operating

Officer of Integrity Bank, acted as an agent of Bancshares and Integrity in

procuring the Bond and SOS acted as an agent of Bancshares, Integrity, and

CIC; (3) Klem listed both Integrity and Bancshares on the application for the

Bond; (4) Integrity issued the check to pay the premium for the Bond; (5)

Integrity filed the Proof of Loss; (6) CIC regarded Integrity's claims as "a

fidelity claim submitted by Integrity . . . under Insuring Agreement A of the

[Bond];" and (7) the unearned premium was returned to Integrity.  In addition, SOS employees, both 30(b)(6) representatives for CIC, and Klem, who submitted the Bond application on behalf of Bancshares and Integrity, have all testified that Integrity was intended to be a named insured under the Bond.

There is no genuine issue that the intent of the parties in requesting and issuing the Bond was that both Bancshares and Integrity were to be named insureds under the Bond and but for a mistake on behalf of representatives for Bancshares, Integrity, and CIC, Integrity would have been listed in the Bond as an additional insured.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen, 121 F.3d at 646 (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587).  No rational trier of fact could find for the Trustee on the issue of reformation of the Bond.  Therefore, it is **ORDERED** that the Bond be reformed to include Integrity Bank as a named insured under the Bond in its own right.

> B.   The Bond does not prohibit the FDIC from bringing a claim on
>       behalf of Integrity

As noted above, even assuming that Integrity is a named insured, the Bond directs the first named insured, Bancshares, to act on behalf of all

insureds.  However, under the facts of this case, Bancshares which is now in

bankruptcy, lacks the ability to act on behalf of Integrity.  Under such a

scenario, the Bond does not restrict Integrity from bringing a claim on its own

behalf.  The language of the Bond anticipates a scenario in which the first

named insured is no longer able to pursue a claim under the bond.  General

Agreement F states:  "If the first named Insured ceases to be covered under this

bond, the Insured next named shall thereafter be considered as the first named

Insured."  (Dkt. [4-1] at 28 of 33).  While the Court does not accept the FDIC's

argument that only those insureds that meet the requirements for

indemnification under the Bond are "covered,"[15] an entity that no longer has

any claim to the Bond, as is the case for Bancshares, cannot be said to be

"covered" by the Bond.  Therefore, if the Bond is reformed to include Integrity

as a named insured, per General Agreement F, it should now be considered the

first named insured, and be able to bring a claim under the Bond.  Even if this

were not the case, and Bancshares could still be considered the first named

insured, the Bond still does not prohibit Integrity from asserting a claim on its

own behalf.

---

[15] See footnote 9, *supra*.

30

The U.S. Court of Appeals for the Fifth Circuit considered a case involving a claim brought by an insured other than the first named insured under an insurance policy that contained provisions requiring the first named insured to bring all claims. New Amsterdam Cas. Co. v. W.D. Felder & Co., 214 F.2d 825 (5th Cir. 1954).[16] Like this action, the Bond at issue in that action was a "fidelity bond protecting against losses of money or property by reason of dishonest acts of employees." Id. at 826. In referring to the joint insured provision of the bond in question, the Fifth Circuit stated:

> Whatever might have been the purpose of inserting that clause in the bond, we are clear in our opinion that under the facts of this case this insured was entitled to maintain this action and that no rights of the defendant or of the first named assured in the bond are jeopardized thereby.

Id. The same can be said of this action. Under the present facts, Integrity is entitled to maintain an action under the Bond and in doing so, it will not jeopardize any rights of CIC or Bancshares. In reaching its conclusion, the Fifth Circuit in New Amsterdam Cas. Co. relied upon Federal Rule of Civil Procedure 17(a)(1), which states that "[a]n action must be prosecuted in the

---

[16] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit . . . handed down by that court prior to [September 30, 1981], shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981).

31

name of the real party in interest."[17]  214 F.2d at 826.  The real party in interest

in this action is the FDIC,[18] and therefore they have the ability to bring an action

under the Bond on behalf of Integrity.[19]

### Conclusion

For the aforementioned reasons, the FDIC's Motion to Dismiss is

**GRANTED**.  The Trustee's Complaint and Cross-Claims Counts One and Two

are **DISMISSED**.  The Trustee's Motion to Compel [39] is **DENIED**, **as moot**.

The FDIC's Motion for Summary Judgment [44] is **GRANTED**.  The FDIC has

standing to seek reformation and the Bond is **ORDERED** reformed to include

---

[17] The Georgia Code similarly states that "[e]very action shall be prosecuted in the name of the real party in interest."  O.C.G.A. § 9-11-17.

[18] "Real party in interest analysis is a matter of federal procedure, but we refer to state law to identify the true owner of the legal interest at issue."  ECI Mgmt. Corp. v. Scottsdale Ins. Co., 23 F.3d 354, 356 (11th Cir. 1994) (citation omitted).  The Supreme Court of Georgia found that a party that was divested of its rights to benefits under an insurance policy and those rights were transferred to a third party, including the right of action necessary to enforce that right, was not the real party in interest.  The third-party to whom the rights were transferred was the real party in interest because "[t]he real party in interest is the person, who, by the substantive governing law, has the right to be enforced."  Allianz Life Ins. Co. of N. Am. v. Riedl, 264 Ga. 395, 398, 444 S.E.2d 736, 738 (Ga. 1994) (citation and punctuation omitted).  Here the substantive governing law is Georgia's law on contract construction and interpretation.  As discussed above, when applying Georgia contract law, the only party with the right to bring a claim under the Bond is the FDIC on behalf of Integrity.

[19] The FDIC, as reciver of Integrity, succeeds to "all rights, titles, powers, and privileges of [Integrity]," including Integrity's claims under the Bond.  12 U.S.C. § 1821(d)(2)(A)(i).

32

Integrity as a named insured. Additionally, the FDIC has the exclusive right to assert the claim set forth in the Proof of Loss. The Trustee's Motion for Summary Judgment [42] is **DENIED**. The right to recover the losses identified in the Proof of Loss are not the property of the Bankruptcy Estate and the FDIC will not be enjoined from taking action to exercise control over the Bond.

**SO ORDERED**, this  17th   day of December, 2010.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)